UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| MELISSA BRADLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:16-cv-158 |
| | ) | Judge Phillips |
| ELMCROFT SENIOR LIVING, LLC | ) | |
| d/b/a ELMCROFT OF KINGSPORT, | ) | |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION

Defendant Elmcroft Senior Living, LLC, d/b/a Elmcroft of Kingsport, LLC ("Elmcroft") has filed a motion for summary judgment as to plaintiff Melissa Bradley's claims of race discrimination and retaliation [Doc. 21]. Having carefully considered the pending motion, related pleadings and materials [Docs. 21, 30, 31], the motion is now ripe for determination.

## I. Relevant Facts

Elmcroft provides assisted living services at operations throughout the country, including an assisted living community in Kingsport, Tennessee. On November 14, 2014, Elmcroft hired plaintiff Melissa Bradley, an African-American female, as a Resident Assistant at the Kingsport facility [Doc. 22-1 at p. 5]. Plaintiff received an hourly wage of $9.00 per hour, which was the wage she requested on her employment application [*Id.* at

p. 6]. Resident Assistants provide a variety of personal care to Elmcroft residents such as helping residents with meals, dressing, bathing, administering medication, and ambulating [Doc. 22-1 at p. 68—71]. Resident Assistants are frequently required to lift and/or move residents and must be able to lift and/or move 25 pounds up to 100 pounds [*Id.*].

At the time of plaintiff's employment, Resident Assistants were assigned to one of three shifts [*Id.* at p. 6]. Plaintiff was initially assigned to the second shift, 3:00 p.m. to 11:00 p.m., but she was later moved to the third shift, 11:00 p.m. to 7:00 a.m. [*Id.* at pp. 6—7]. The first and second shifts are staffed with approximately eight (8) Resident Assistants, but only three (3) Resident Assistants are assigned to the third shift when most residents are sleeping [*Id.* at p. 7].[1] Elmcroft asserts, and plaintiff does not dispute, that it is critically important for each of the third shift Resident Assistants to be able to lift or transfer residents in case of emergency [*Id.* at p. 7—8].

In May 2015, Kay Adkins, the Executive Director of Elmcroft's Kingsport facility, met with the third shift Resident Assistants, including plaintiff, to discuss their concerns [Doc. 31-1 at pp. 7—8]. Ms. Adkins testified that the third shift Resident Assistants expressed a desire for a supervisor on their shift and plaintiff expressed an interest in that role [*Id.*]. Plaintiff testified that a few weeks after this conversation, on May 28, 2015, Ms. Adkins came in during the third shift and told plaintiff she was going to get the promotion to supervisor and a raise [Doc. 22-1 at p. 11]. Plaintiff claims she signed a form stating her pay would increase to $9.75 per hour [*Id.*]. Plaintiff claimed that she became the night

---

[1] Ms. Adkins testified that four (4) Resident Assistants are assigned to the third shift [Doc. 31-1 at p. 7].

shift supervisor, but she never received the promised pay raise [*Id*. at pp. 11—12]. Elmcroft's – and Ms. Adkins' – position is that no third shift supervisory position was created, plaintiff was not promoted, plaintiff was not given a raise, and no paperwork was prepared [Doc. 31-1 at p. 16]. Plaintiff claims she did not question the fact that she did not immediately receive the pay increase "[b]ecause I knew that it would take time for it to go through" [Doc. 22-1 at p. 13].

On June 28, 2015, plaintiff injured her left knee while assisting a resident [Doc. 22-1 at p. 13]. Plaintiff's physician diagnosed her with a "left knee sprain" and released her to return to work on June 29, 2015 with light duty restrictions [*Id*. at pp. 13, 72]. These restrictions remained in place until September 15, 2015 [*Id*. at p. 73]. Because of her light duty restrictions, plaintiff could not perform the third shift Resident Assistant duties, such as lifting residents, and she was moved to the second shift [*Id*. at pp. 13—14, 44].

On August 16, 2015, plaintiff asked Ms. Adkins why she had never received the promised pay raise to $9.75 per hour [*Id*. at p. 13]. According to plaintiff, Ms. Adkins responded with three reasons: "workman's comp had kicked it out," plaintiff "could not perform the job," and "she had an issue with me telling somebody that I had got a raise" [*Id*.]. Plaintiff met with Ms. Adkins and Sarah Absher, the Resident Services Director, the next day, August 17, 2017, to discuss the pay increase and they advised her that they had hired someone for her third shift position because she could not perform the work [*Id*. at

3

pp. 16, 18].[2] Plaintiff admittedly made secret recordings of one or more of these conversations with Ms. Adkins and Ms. Absher [Doc. 22-1 at p. 15]. Around August 25, 2015, someone placed a DVD containing these recordings under Ms. Adkins' door, but plaintiff claims she did not do it [*Id*. at pp. 15, 17, 46]. Sheryl Klein, Elmcroft's Regional Director of Operations for Tennessee, contacted plaintiff to discuss the recordings and plaintiff's concerns about her pay, but plaintiff refused to discuss her concerns [Doc. 31-1 at ¶ 4].

On August 26, 2105, plaintiff submitted an Intake Questionnaire to the United States Equal Employment Opportunity Commission ("EEOC") alleging race discrimination and retaliation [Doc. 22-1 at pp. 18, 74—76]. She submitted a signed Charge of Discrimination on September 3, 2015, alleging race and disability discrimination and retaliation [*Id*. at pp. 24, 78].[3]

On September 13, 2015, Ms. Klein again contacted plaintiff by phone to set up a meeting to discuss plaintiff's concerns but plaintiff declined because she did not feel comfortable doing so [*Id*. at p. 25].[4] Plaintiff also claims that Ms. Klein asked if plaintiff had an attorney and she declined to discuss that too [*Id*. at p. 29]. Ms. Klein states that she called plaintiff because plaintiff "continued to complain to other employees about that

---

[2]Plaintiff later agreed that she was told that the person was already hired, not to replace her, but then assigned to the third shift because Elmcroft needed three Resident Assistants on the third shift [Doc. 22-1 at pp. 16—17].
[3]Plaintiff has not asserted a claim for disability discrimination in this case.
[4]Plaintiff testified that this conversation took place on "a Friday. That was September 13" [Doc. 22-1 at p. 25]. Elmcroft points out that Friday was September 11. The discrepancy is not material for purposes of the instant motion.

4

matter" and that plaintiff refused to speak with her "upon advice of her attorney" [Doc. 31-3 at ¶ 7].

A few days later, on September 15, 2015, Ms. Klein and Ms. Adkins asked plaintiff to meet with them to discuss the issues with her pay [Doc. 22-1 at p. 29]. Plaintiff again refused, stating that she "just didn't feel comfortable talking about it" [*Id.*]. Plaintiff also refused to identify her attorney and at that point plaintiff was suspended [*Id.* at pp. 29—30]. According to Ms. Klein, "she was told by her attorney not to discuss the matter with anyone at Elmcroft" and she "was not comfortable giving me her attorney's name" [Doc. 31-3 at ¶ 8]. Ms. Klein placed plaintiff on administrative leave "because she had been causing disruption among other employees and I needed additional time to investigate the matter" [*Id.* at ¶ 9]. Ms. Klein told plaintiff to "have her attorney contact me if they had any questions or wanted to discuss the matter" [*Id.*]. Plaintiff purportedly "mentioned an individual's name who she claimed represented her, but when we looked into it the person was not an attorney and may have been her boyfriend" [*Id.*].

At the time, plaintiff did not have an attorney to identify so "I knew I wasn't going to come back because there was no attorney to tell" [Doc. 22-1 at p. 30]. The following day, September 16, 2015, plaintiff resigned her position at Elmcroft [*Id.*].

II.     **Standard of Review**

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears

5

the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). "Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479—80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

**III.    Analysis**

   **A.    Race Discrimination**

Plaintiff has asserted claims of race discrimination in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.  Title VII prohibits an employer from "discriminat[ing] against any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U .S.C. § 2000e–2(a)(1).  Section 1981 states in part that "[a]ll persons … shall have the same right … to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."  42 U.S.C. § 1981.  Both claims are analyzed using the same elements and allocations of the burden of proof. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir.), *cert. denied*, 31 U.S. 1052 (2000).  A Title VII claim may be established through direct or circumstantial evidence. *See, e.g., DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).  There appears to be no contention that plaintiff has direct evidence of discrimination and, instead, bases her claim on circumstantial evidence.

A claim of discrimination under Title VII is analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007), *cert. denied*, 552 U.S. 1258 (2008).  The plaintiff must first establish a prima facie case of race discrimination by demonstrating: (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that she was qualified for the job; and (4) that

7

she was replaced by a person outside of the protected class or her employer treated similarly situated employees outside the protected class more favorably. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006); *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246—47 (6th Cir. 1995), *overruled on other grounds by Gross*, 557 U.S. 167.[5] Once a prima facie case has been shown, the plaintiff is entitled to a presumption that the defendant discriminated against her in violation of Title VII. *Wright*, 455 F.3d at 706.

The defendant then bears the burden of production to put forth a "legitimate, nondiscriminatory reason" for the complained of adverse treatment. *Id.* (citing *DiCarlo*, 358 F.3d at 414). "The explanation provided must be legally sufficient to justify a judgment for the defendant." *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)). If the defendant meets this burden, the presumption created by the prima facie case falls away and the plaintiff must then show that the defendant's proffered reason was a "pretext for discrimination." *Id.* Throughout this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate. *Id.*; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *see Moffat v. Wal-Mart Stores, Inc.,* 624 F. App'x 341, 349 (6th Cir. 2015) ("A plaintiff's *prima facie* case, together with evidence showing the employer's proffered reason is false, permits the jury to infer the ultimate fact of intentional discrimination.").

---

[5]To the extent that plaintiff's claim is considered a failure to promote, as discussed *infra*, a plaintiff may establish a prima facie claim for failure to promote by demonstrating that (1) she is a member of a protected class; (2) she applied for and was qualified for the promotion; (3) she was considered for and was denied a promotion; and (4) other employees not in the protected class of similar qualifications received promotions. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020—21 (6th Cir. 2000).

8

Plaintiff has raised three complaints regarding her tenure at Elmcroft: (1) she never received the pay raise and promotion she "signed for" in May 2015 [*Id*. at ¶ 12]; (2) her pay rate was less than that of employees of different races [Doc. 1 at ¶¶ 20, 27]; and (3) she was suspended in retaliation for filing an EEOC charge [*Id*. at ¶¶ 24—25].

### 1. Failure to promote

Elmcroft first argues that plaintiff was not qualified for the position of third shift Resident Assistant or supervisor because of her knee injury [Doc. 22 at p. 11—12]. At the prima facie stage, the Court must focus on the plaintiff's objective qualifications for the relevant position. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003). There is no dispute that plaintiff was qualified for the Resident Assistant position prior to her injury and Elmcroft has presented no evidence that her performance was lacking. Thus, she had the "education, experience in the relevant industry, and demonstrated possession of the required general skills" to do the job. *Id*. at 576.

Elmcroft points to the fact that plaintiff was on light duty from June 28, 2015 until the time of her resignation and thus she could not physically perform the Resident Assistant job [Doc. 22-1 at pp. 40—41]. However, plaintiff's testimony is more equivocal. She first stated that she could not physically do the job, but then said, "I don't know. …I don't know because of my knee" [Doc. 22-1 at pp. 40—41]. Because the burden of establishing a prima facie case should not be "onerous," *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (quoting *Burdine*, 450 U.S. at 253), the Court finds there is some evidence in the record, viewed in the light most favorable to the plaintiff, that plaintiff met "the minimum objective criteria" for the position. *Wexler*, 317 F.3d at 576.

9

Elmcroft next argues that plaintiff did not suffer an adverse employment action because her pay was never "lowered" following her knee injury [Doc. 22 at p. 12]. Plaintiff does not dispute that her pay was never "lowered," as she received $9.00 per hour during the entirety of her employment [*Id.* at p. 11]. Her contention, rather, is that she did not receive the pay *increase* and promotion she was promised and "signed for" [*Id.*]. Plaintiff relies on her recorded conversation with Ms. Adkins in August 2015, in which Ms. Adkins states that the promotion was "null and voided" because plaintiff had discussed the pay raise with another employee [Doc. 31-1 at p. 13]. It is undisputed that "a failure to promote is an adverse employment action." *Johnson v. United Parcel Serv.*, 117 F. App'x 444, 450 (6th Cir. 2004) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 562—63 (6th Cir. 2000)). Viewing the facts in the light most favorable to the plaintiff, the Court finds that plaintiff has alleged an adverse employment action regarding the failure to promote.

Elmcroft next argues that plaintiff cannot point to any similarly situated employees outside the protected class who were treated more favorably [Doc. 22 at pp. 13—14]. A plaintiff may establish the fourth element of a prima facie case by identifying at least one comparable employee outside the protected classification who was similarly situated in all relevant respects, but who nonetheless received more favorable treatment. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). A plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly situated." *Id.* Rather, a plaintiff need only show that they are similar in all relevant aspects. *Id.*; *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610—11 (6th Cir. 2002).

Plaintiff testified that April Reeves, a Caucasian Resident Assistant, was injured on the job but that her pay raise was not taken away [Doc. 22-1 at p. 24].[6] As Elmcroft notes, plaintiff presents no evidence of April Reeves' pay rate before or after her work injury [Doc. 22-1 at p. 24]. "Mere conclusory statements regarding alleged discrimination, which are unsupported by specific facts fail to raise a genuine issued of material fact and are insufficient to survive a motion for summary judgment." *Thompson v. Henderson*, 226 F. App'x 466, 478 (6th Cir. 2007) (citing *Ackerman v. Diamond Shamrock Corp.,* 670 F.2d 66, 69—70 (6th Cir. 1982)). Plaintiff must present more than a mere allegation that another employee was similarly situated to establish a prima facie case. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582—83 (6th Cir. 1992) (plaintiff must produce evidence that he was treated differently than similarly situated non-minority employees); *see Anderson*, 477 U.S. at 257 (party opposing summary judgment must present "affirmative evidence" to support her position).

More importantly, as described above, the appropriate comparison is not someone whose pay was "lowered," because plaintiff admits that her pay was not lowered. Rather, the appropriate comparison is whether an employee outside the protected class was awarded a promotion. Plaintiff contends that the reasons given by Ms. Adkins for why plaintiff was not promoted are pretextual, relying on the recorded conversation in which Ms. Adkins discussed the promotion "in the present tense" [Doc. 30-1 at pp. 4—5].

---

[6]Plaintiff's brief asserts that Ms. Adkins was unable "to even name another single African-American currently on the payroll" and "[p]resumably, everyone is being treated better than the plaintiff" [Doc. 30-1 at p. 6]. This argument is purely speculative.

However, in the absence of a prima facie case, the Court need not consider whether plaintiff can make a showing of pretext. *Agnew v. BASF Corp.*, 286 F.3d 307, 311 (6th Cir. 2002).

Assuming the truth of plaintiff's testimony, *i.e.*, she was offered and "signed for" the promotion to third shift supervisor, she has presented no evidence of any other Elmcroft employee who was promised a promotion and received it under similar circumstances. Nor has she presented evidence that an employee outside the protected class received the promotion to third shift supervisor instead of her. According to plaintiff, Ms. Adkins stated, "they had to hire someone else to replace me" on the third shift, but plaintiff later testified that Ms. Adkins stated they hired someone "but it wasn't to replace me" [Doc. 22-1 at pp. 14, 16]. Plaintiff agreed that someone had to fill her spot on the third shift while she was on light duty [*Id.* at p. 16]. Plaintiff could not identify this person and she does not know if anyone is working as a supervisor on the third shift [Doc. 22-1 at p. 34]. Ms. Adkins, Ms. Absher, and Ms. Klein testified that no one, including plaintiff, was ever promoted to the position of third shift supervisor at any time [Doc. 31-1 at p. 19; Doc. 31-2 at p. 6; Doc. 31-1 at ¶ 4]. Even accepting the portion of her testimony where Ms. Adkins said plaintiff had been replaced (and simultaneously ignoring the portion of plaintiff's testimony that Ms. Adkins later stated plaintiff had not been replaced), plaintiff has presented no evidence that the purported "replacement" was outside the protected class – the most basic requirement of the "similarly situated" test. Without evidence that a similarly situated individual outside the protected class was treated more favorably, there is no basis from which to infer discrimination.

Again, plaintiff has failed to present more than an allegation that an unidentified person was performing her Resident Assistant duties on the third shift. Thus, without any evidence that she was replaced by someone outside the protected class or that a similarly situated person was promoted, plaintiff cannot establish a prima facie case of discrimination as to her promotion claim.

### 2. Pay Rate

With respect to her starting pay rate, plaintiff alleges that she "found wage discrepancies in the amounts being paid to employees of different races" and "[w]hite new hires were also being paid consistently more than their African-American counterparts who had the same or more experience [Doc. 1 at ¶¶ 20, 27]. Plaintiff identified three Caucasian Resident Assistants who had a higher rate of pay than she did: Megan Crumley ($9.37 per hour); Penny Ketron ($10.50 per hour); and Lauren Taylor ($10.00 per hour) [Doc. 22-1 at pp. 20—23, 47]. Elmcroft argues that plaintiff has no evidence that her pay rate was different from Caucasian Resident Assistants with similar qualifications and experience and plaintiff has admitted that one Caucasian Resident Assistant also received a starting salary of $9.00 per hour [Doc. 22 at p. 16]. Ms. Adkins and Ms. Absher testified that the starting pay rate for Resident Assistants may vary based on experience and certifications [Doc. 31-1 at p. 5; Doc. 31-2 at pp. 5—6].

Plaintiff admittedly has no knowledge of the education, experience, or length of tenure of any of the three Resident Assistants with whom she seeks to compare herself. Instead, she simply asserts that she is similarly situated to these employees because they are all Resident Assistants and they each told her they had a higher rate of pay. This falls

13

far short of her burden to show that she is similarly situated to these employees "in all of the relevant aspects." *Ercegovich*, 154 F.3d at 352; *see also Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004) ("[d]ifferences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated"). Moreover, plaintiff's admission that one Caucasian Resident Assistant, George Wagner, also earns $9.00 per hour rebuts any inference that the starting pay rate is based on race. The Court finds that plaintiff cannot establish a prima facie case of discrimination as to her pay rate.

     3.    <u>Suspension</u>

Elmcroft asserts that plaintiff's suspension would have been paid, and therefore was not an adverse employment action [Doc. 22 at p. 12 (citing *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004))]. However, Ms. Klein admits she is "not sure" whether that "intent" was communicated to plaintiff [Doc. 31-3 at ¶ 9], and plaintiff testified that she did not ask whether she would be paid while on suspension [Doc. 22-1 at p. 46]. It is undisputed that a suspension without pay constitutes an adverse employment action. *White v. Burlington Northern & Santa Fe R. Co.*, 364 F.3d 789, 803 (6th Cir. 2004). However, plaintiff resigned the next day and therefore never served her suspension.[7] The Sixth

---

[7]Plaintiff's brief casually suggests that her "resignation was far from voluntary" [Doc. 30-1 at p. 5]. "A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (citations omitted). In order to establish a constructive discharge, a plaintiff must present evidence "that 1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." *Id*. at 727—28. To the extent that plaintiff intended to raise a claim for constructive discharge, she has made no effort to satisfy either element or provided any further evidence or argument for such a claim.

Circuit has unequivocally held that a suspension without pay that is never served is not an adverse employment action. *Lee v. Cleveland Clinic Foundation*, 676 F. App'x 488, 497 (6th Cir. 2017) ("service of a suspension is a requirement if it is to rise to the level of an adverse employment action"). Accordingly, plaintiff's suspension, whether with or without pay, was not an adverse employment action under these circumstances and she cannot establish a prima facie case of race discrimination as to her suspension.

In sum, the Court concludes that plaintiff cannot establish a prima facie case of race discrimination on any of her complaints. In the absence of a prima facie case, the Court need not consider whether plaintiff can make a showing of pretext. *Agnew*, 286 F.3d at 311.

B. <u>Retaliation</u>

Plaintiff testified that she believed she did not get her requested paid time off ("PTO") because she had filed an EEOC complaint [Doc. 22-1 at pp. 26—28]. She requested PTO from September 14 through September 21, 2015 "to get therapy for my knee" but she never received a firm answer to her request and thought she was getting "the run around" [*Id.*]. Plaintiff submitted a written addition to her retaliation charge with the EEOC and a copy of her request for PTO [Doc. 22-1 at pp. 79—80, 82]. This allegation is not addressed by either party in any brief. To the extent that plaintiff is asserting this as part of her retaliation claim, "a single denial of leave is not an adverse employment action when it affects leave on a specific date and time." *McElroy v. PHM Corp.*, 622 F. App'x 388, 391 (5th Cir. 2015) (quoting *Ogden v. Potter*, 397 F. App'x 938, 939 (5th Cir. 2010).

Plaintiff's primary complaint in support of her retaliation claim is that she was

15

"suspended indefinitely without pay in retaliation for her EEOC filing and complaints" [Doc. 1 at ¶ 40]. Ms. Klein states that plaintiff was placed on "administrative leave pending further investigation of the matter" after Elmcroft received notice of the EEOC charge and plaintiff refused to discuss her complaints [Doc. 31-1 at ¶ 9]. Ms. Klein states that she took this action because plaintiff "had been causing disruption among other employees and I [Ms. Klein] needed additional time to investigate the matter" [*Id.*]. Ms. Klein admits that she does not recall if plaintiff was specifically informed that the administrative leave would have been paid [*Id.*].

To make out a prima facie case of retaliation, the plaintiff must establish that: (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008). Retaliation claims are subject to "traditional principles of but-for causation … This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Elmcroft argues that plaintiff did not suffer an adverse employment action because she resigned "before the suspension took full effect" [Doc. 22 at p. 17]. An adverse employment action is defined as "'a materially adverse change in the terms of [one's] employment.'" *White*, 364 F.3d at 797 (quoting *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 885 (6th Cir. 1996)). As discussed above, the undisputed facts reflect that plaintiff

16

was suspended on September 15, 2015, and she resigned on September 16, 2015. While the Court assumes that Elmcroft did not intend for plaintiff' suspension to last only one day, that is nevertheless what happened. It is well settled that a suspension *with* pay is not an adverse employment action, *White*, 364 F.3d at 803, and it is now clear that a suspension *without* pay that is never served is not an adverse employment action. *Lee*, 676 F. App'x at 497. Accordingly, plaintiff's suspension, whether with or without pay, was not an adverse employment action under these circumstances. Because she has not suffered an adverse employment action, plaintiff cannot establish a prima facie case of retaliation. As with her discrimination claim, because she cannot establish a prima facie case, the Court need not consider whether plaintiff can make a showing of pretext. *Agnew*, 286 F.3d at 311.

## IV. Conclusion

As set forth above, the Court concludes that plaintiff cannot establish a prima facie case of race-based discrimination or retaliation. Therefore, the defendant's motion for summary judgment [Doc. 21] will be **GRANTED**. An appropriate order will be entered.
,

                                       s/ Thomas W. Phillips
                                       SENIOR UNITED STATES DISTRICT JUDGE